[No. 1762.]

J. W. Roberts v. The State.

1. Malicious Mischief — Statutory Repeal.— The offense defined by article 684 of the Penal Code consists in breaking, pulling down or injuring the fence of another without the owner's consent, and the penalty prescribed is a fine of not less than ten nor more than one hundred dollars. An act was passed at the special session of the Eighteenth Legislature prescribing the punishment for the wanton and wilful cutting, injuring or destruction of fences. This act took effect on the 6th day of February, 1884, and was in force when the information in this case was filed, but not when the offense was alleged to have been committed. To be guilty of the offense defined by the last mentioned act, the party must wantonly, or with intent to injure the owner, wilfully cut, injure or destroy a fence, or part thereof, the property of another. The penalty prescribed is confinement in the penitentiary for not less than one nor more than five years. Held, that additional elements than those which enter into the first enter into the offense defined in the last mentioned act, and the effect of the latter is not to repeal the former act.·

2. Same.— But, even though it were true that the offenses defined in the two acts are the same, and the penalty attached to article 684 was altered by the last mentioned act, such fact would not work a repeal of the first by the last act, the rule applicable being that prescribed by article 15 of the Penal Code. See the opinion in extenso for a quotation of the said section 15.

Appeal from the County Court of Kaufman. Tried below before the Hon. J. E. Dillard, County Judge.

The conviction in this case was had upon an information which charged that the appellant " did, on the 7th day of December, 1883, unlawfully, wilfully, wantonly and maliciously break, pull down and injure the fence of C. M. Bivens and Wiley Kirby, without their consent or the consent of either of them," etc. A fine of $10 was the punishment imposed.

W. S. Cobb was the first witness for the State. He testified that he was on the 7th day of December, 1883, and still was in the employ of Messrs. Bivens & Kirby, the owners of the fence alleged to have been broken. That fence was constructed of two barbed wires and two rails or posts. Almost every day during the said month of December, the witness rode around the said fence to see that it was in good condition, and that no stock had broken in or out. Witness usually took this ride in the evening. He frequently found it broken on the west side, and always repaired it by lapping and twisting the wires. The witness took his ride around that fence on the morning of December 7, 1883, and on the west side of the pasture inclosed by said fence, he saw the defendant and Lee Clark working at the fence. Witness was about forty yards distant from the parties

named when he first saw them. Witness whistled, when the defendant and Clark quit their work, mounted their horses and ran off about one hundred yards, at which distance Clark dropped his hat. The defendant and Clark then stopped, and in a minute or two rode back. Witness then found that both wires and one post were down at the place on the fence where the defendant and Clark had been at work.

When they came back the defendant and Clark said that they were hog hunting, and asked if they could go inside the pasture. Witness gave consent, and the defendant and Clark, going inside the pasture, assisted witness in fixing up the fence at that point. Clark's father had hogs that ranged in that pasture. Witness, on one occasion, saw Clark drive two hogs out of that pasture. The fence on the west side of the pasture, where it was broken, served as a dividing or cross fence between the pastures of Bivens & Kirby and the father of Clark. That fence had been built by C. M. Bivens, and Clark's father had joined his fence to it. The defendant, who was a tenant of Clark's father, lived inside of Clark's pasture. A gate on a third-class road opened into Bivens & Kirby's pasture, and this gate was nearer to the defendant's house than was the point where he broke the fence. The fence of Bivens & Kirby inclosed a pasture containing a league of land. The fence was not hog proof, nor was it located in a hog district. It had been broken several times previously at the point where the witness saw the defendant and Clark working with it. Two days previous to the said December 7th, the witness had fixed that fence at that same identical place, by doubling back the wire and twisting it hard with a pair of pincers. Witness has not seen the fence broken at that place since the said December 7th. The pasture described was in the possession of Bivens & Kirby. The witness denied that, in October, 1883, he told George Jones that there was a gap in the cross fence, about where it was cut by the defendant and Clark. He did, however, tell the said Jones that the said fence had been broken at that point, and that he, witness, had repaired it.

Wiley Kirby testified, for the State, that he and C. M. Bivens owned and controlled the pasture and fence alleged to have been broken. Bivens had leased the land inclosed by the fence for a term of ten years, and built the fence around it. The partnership between the witness and Bivens was entered into early in 1883, and was to continue for five years. Under the articles of that partnership the witness owned a one-half interest in the pasture and fence for the period of five years, and Bivens owned the other half. The

witness, who was the managing partner, lived in the said pasture. Bivens lived at Terrell, some twenty miles distant. Witness at no time consented that defendant Clark or any one else should break or cut said fence. On the Wednesday prior to the Friday on which it is charged this breaking was done, the witness and W. S. Cobb repaired a break in this fence at this same point. They repaired it securely by doubling the wire back and twisting it hard with wire pincers. A short time after this breaking the witness told R. B. Shaw, Jr., that he did not believe Lee Clark cut this fence with intent to injure the witness and Bivens, but the witness did not include the defendant in that remark. Witness's purpose in making this remark to Shaw was that, knowing Shaw to be a brother-in-law to Clark, he hoped that Shaw would speak to Clark and prevail upon him to stop cutting this fence. Witness and Clark had been on good terms up to this time. Witness had seen the defendant but once or twice, and scarcely knew him.

C. M. Bivens testified, for the State, that he and Wiley Kirby owned the pasture and fence, and that the fence was cut without his consent.

George Jones testified, for the defense, that some time in the fall of 1883, the State's witness, W. S. Cobb, told him that there was a gap on the west side of Bivens & Kirby's pasture fence, where it had been broken, and that persons could go through the said gap. The witness had himself seen the place referred to. The wires at that point were merely doubled back and hooked. It was some time before this offense is charged to have been committed that the witness saw the break referred to. He had not seen the place since it is charged to have been broken by the defendant.

R. B. Shaw, Jr., testified, for the defense, that some time in December, 1883, and subsequent to the alleged breaking, Wiley Kirby told him, witness, that he was satisfied that Clark and the defendant did not break the said fence for the purpose of injuring Bivens & Kirby.

The motion for new trial raised the questions discussed in the opinion.

*Woods & Cunningham*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

Hurt, Judge. This is a conviction for breaking and pulling down a fence, under article 684, Penal Code. The appellant was fined $10. The information was filed on the 3d day of March, A. D.

1884. The offense was committed on or about the 7th day of December, 1883.

An act was passed by the Eighteenth Legislature, at its special session, prescribing the punishment for the wanton and wilful cutting, injuring or destroying fences. This act took effect the 6th day of February, 1884, and was in force at the time of the filing of the information in this case.

Appellant contends that article 684 was repealed by this act of the called session of 1884, and that, therefore, the penalty of article 684 cannot be enforced.

*First:* Does the last act repeal article 684? We are of the opinion that it does not. The elements of the offense contained in article 684 consist in breaking, pulling down, or injuring the fence of another, without the owner's consent. This offense is punished by fine not less than ten nor more than one hundred dollars. To be guilty of the offense contained in the last act, the party must wantonly, or with intent to injure the owner, and wilfully cut, injure or destroy a fence or part thereof, the property of another. And the penalty for this offense is confinement in the penitentiary not less than one nor more than five years. By a comparison of article 684 with the last act, it will readily be perceived that additional elements enter into the offense contained in the last act.

But, let us concede the offenses to be the same, and that the penalty of article 684 is altered by the last act; does this work a repeal of the first act? We think not. What is the rule? Article 15, Penal Code. " When the penalty for an offense is prescribed by one law, and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and, if convicted, punished under that law; except that, when by the provisions of the second law the punishment of the offense is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed."

The last act does not attempt in terms to repeal article 684, nor its penalty. Nor does article 20, Penal Code, apply to the state of facts presented in this case.

We find no error in the judgment, and it is affirmed.

*Affirmed.*

[Opinion delivered November 15, 1884.]